```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
                       COLUMBUS DIVISION
```

JENNIFER ELAINE SMITH,           \*
                                 \*
Plaintiff,                       \*
                                 \*
v.                               \*     Case No. 4:03-CV-182 (CDL)
                                 \*
BURNS INTERNATIONAL SECURITY     \*
SERVICES,                        \*
                                 \*
Defendant.                       \*

O R D E R

Defendant Burns International Security Services ("Burns") has filed a Motion for Summary Judgment on Plaintiff's claims of retaliation and sex discrimination under Title VII and Plaintiff's state law claims of intentional infliction of emotional distress and negligent retention.[1]  In her response to Defendant's motion, Plaintiff expressly abandons her claims of retaliation and negligent retention.  Accordingly, the only remaining claims for disposition by the Court are Plaintiff's claims of sex discrimination and intentional infliction of emotional distress.[2]  For the reasons that follow, Defendant's motion is granted as to both claims.

---

[1]Plaintiff had previously named as Defendants to this suit Columbus Water Works and the City of Columbus; stipulations of dismissal with prejudice have been entered as to those Defendants so that Burns is the only remaining Defendant in the case.

[2]In Plaintiff's Complaint, she alleges that she received less pay than her male counterparts.  However, Plaintiff and her counsel make clear in Plaintiff's deposition that Plaintiff has not asserted a claim under the Equal Pay Act.

**I.    BACKGROUND**

Defendant Burns provides contract security services to various clients and facilities, including the Columbus Water Works. Plaintiff began her employment with Burns on August 1, 2002 as a security guard. Jim Owens, the Scheduling Manager, hired Plaintiff. As Scheduling Manager, it was Owens's responsibility to assign employees to clients' sites.  Initially, Owens assigned Plaintiff to work at Corrections Corporation of America during the third shift (11:00 p.m. to 7:00 a.m.) one night per week at $6.50 per hour.  Plaintiff was also assigned to work at Mead Corporation, also on the third shift at $6.55 per hour.  Within a few days of the start of her assignment at Corrections Corporation of America, Plaintiff asked to be transferred to a different site.  In response, Owens scheduled Plaintiff only for shifts at Mead.

Plaintiff continued to work at Mead until September 24, 2002, when she requested to be transferred to the first shift (7:00 a.m. to 3:00 p.m.) because of difficulties in obtaining child care.  Owens subsequently transferred Plaintiff to the first shift at Columbus Water Works (CWW).  Plaintiff received $10.00 per hour for her work at CWW.

Burns employees at CWW are assigned to positions at either the front gate or pump station. Plaintiff was initially assigned to the front gate, where she was supervised by Kim Lewis.  Her responsibilities at the front gate included checking identification

2

of individuals attempting to access CWW and ascertaining that they were authorized to enter the site.

After finishing her shift on March 13, 2003, Plaintiff left CWW to meet a male friend in a park located near the front gate of CWW. Two other Burns employees, Ed Brown and Larry Jordan, observed Plaintiff sitting in the park with a man; Brown informed security guard Lois Brassard of what he and Jordan had seen. That same day, Brassard testified that she informed Owens that Brown and Jordan had reported seeing Plaintiff at the park, wearing her uniform and "rolling around in the grass" with a man.

Plaintiff testified that the following day, Brown told Plaintiff that he had seen her in the park and asked her who was with her. Brown later told Plaintiff that he had reported to Brassard that he had seen her in the park with a man while she was still in uniform. During this same time, Site Supervisor Lynwood Johnson told Lewis that Brown had reported seeing Plaintiff in the park acting inappropriately with a man while she was wearing her uniform. Johnson directed Lewis to speak with Brown and Jordan regarding their allegations.

Lewis told Owens that she had spoken with Brown and Jordan and that they had confirmed observing Plaintiff "fooling around" with a man in the park while wearing her uniform.[3] Johnson also confirmed

---

[3] In their depositions, Brown and Jordan both deny reporting anything other than seeing Plaintiff in a park with a man; they state that they did not report any untoward conduct of Plaintiff. They also both deny ever speaking to Lewis about seeing Plaintiff in the park. To further confuse the issue, Owens recalls only speaking to Johnson and Plaintiff about the incident in question.

with Owens that Brown and Jordan had reported the same allegations to him.

On March 20, 2003, Lewis informed Plaintiff of the allegations and gave Plaintiff a written disciplinary notice for conducting herself inappropriately while in her Burns uniform. Plaintiff admitted that she had violated Burns's policy by wearing her uniform in the park after her shift had ended, but stated that Brown's allegations about her behavior in the park were false and motivated by the fact that Brown had a crush on her. She acknowledged in her deposition that she may have hugged her friend. Nevertheless, Plaintiff did not dispute the disciplinary action.

Approximately a week after she received notice of the disciplinary action, Lewis told Plaintiff that she would have to switch shifts at CWW or transfer to another site. Lewis also told Plaintiff to contact Owens if she had any questions about this change in her assignment.

Plaintiff did contact Owens, who testified that he offered Plaintiff the options of switching to the second shift at CWW at the same rate of pay or transferring to the first shift at another location. While working the second shift at CWW, Plaintiff would also be assigned to the pump station instead of the front gate. Plaintiff testified that Owens told her that due to the recent heightened

4

national security level, he needed to move her from the gate and put a man in the position instead.[4]

Plaintiff, citing her child care arrangements, turned down the second shift position at CWW, although she did not attempt to make alternate arrangements before declining the position. Plaintiff was then assigned to work at the Atmos Energy site beginning on March 26, 2003. Her pay at that location was $7.00 per hour. Plaintiff was then transferred to a Columbus Regional site in Phenix City, Alabama, after security needs at Atmos Energy diminished. She received $6.00 per hour at the Columbus Regional location. Plaintiff worked at that location until May 6, 2003, when she failed to report to work. Plaintiff officially resigned from Burns on May 16, 2003, by signing a statement that her resignation was due to working conditions at the Columbus Regional location. She also stated at that time that she had obtained alternative employment.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on May 6, 2003, alleging discrimination on the basis of sex. Plaintiff asserted that Burns discriminated against her by removing her from the first shift position at CWW and replacing her with a male. Her right-to-sue

---

[4]The Court takes judicial notice of the fact that the Homeland Security Advisory System threat level was increased from yellow (elevated) to orange (high) on March 17, 2003, when the Department of Homeland Security implemented Operation Liberty Shield, a comprehensive effort to guard the nation's military installations, ports, waterways, and other infrastructure. Operation Iraqi Freedom began on March 19, 2003.

letter was issued by the EEOC on September 4, 2003.  Plaintiff filed the instant action on December 1, 2003.

**II.   SUMMARY JUDGMENT STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.*  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

In evaluating the evidence at the summary judgment stage, "the evidence of the non-movant is to be believed."  *Anderson*, 477 U.S. at 255.  "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences . . . in his favor."  *U.S. v. Four Parcels*, 941 F.2d 1428, 1437 (11th Cir. 1991)(internal quotations and citations omitted).

6

**III. DISCUSSION**

**A.   Title VII Claim**

Title VII of the Civil Rights Act of 1964 prohibits employers from intentionally discriminating against employees based on their race, religion, sex, or national origin.  42 U.S.C. § 2000e. Specifically, the anti-discrimination clause of Title VII, which is applicable here, makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In this case, Plaintiff has produced direct evidence that she was reassigned to another shift because of her sex.[5]  Therefore, for purposes of Defendant's summary judgment motion, the Court must accept this evidence as true.

Defendant argues that notwithstanding direct evidence of its intentional discriminatory conduct, Plaintiff's discrimination claim must still fail as a matter of law because the reassignment of

---

[5] Plaintiff testified that Owens told her that he transferred her to another shift because "it looks better when all the traffic's coming in and out first shift during the day that with the alert on high that a man be there instead of a woman."  (Pl.'s Dep. at 90.)  Owens denies telling Plaintiff that he was moving her because he wanted a man to work at the front gate.  In his deposition, he testified that he transferred Plaintiff to the pump position because of the allegations regarding her conduct while in her uniform in public, potentially in the view of CWW employees.  Owens stated that he felt that Plaintiff had lost her effectiveness as a security guard and needed to be moved to a position that was less visible.  For purposes of summary judgment, however, the Court must accept Plaintiff's allegations as true.

7

Plaintiff to another shift with the same pay and benefits does not amount to an adverse employment action, which Defendant maintains is a separate and essential element of a Title VII claim. Plaintiff responds that while an adverse employment action may be an element of a *prima facie* case for discrimination when the only evidence of discrimination is circumstantial, it is not (or should not be) an essential element for a Title VII claim when there is direct evidence of discrimination. Plaintiff argues that the clear language of Title VII's anti-discrimination clause does not justify an interpretation that superimposes upon it a requirement that the discrimination must affect the terms, conditions, and privileges of employment in some *material* way. The plain language of the statute simply provides that an employer cannot discriminate "*with respect to* [an employee's] compensation, terms, conditions or privileges of employment." 42 U.S.C. §2000e-2(a)(1) (emphasis added). Therefore, Plaintiff argues that once discrimination has been established, Plaintiff need only show that the discrimination affects Plaintiff's employment in some way (even if the effect is *de minimis)* and that the discrimination caused some damage to Plaintiff however slight.[6] The issue presented

---

[6] Plaintiff argues that the adverse employment action requirement should be reserved for purely circumstantial evidence cases as a type of filter designed to establish that there is sufficient evidence that Defendant engaged in intentional discrimination. Plaintiff's imposition of an additional evidentiary burden in a circumstantial evidence case, however, ignores the well-established principle that the law makes no distinction as to the weight that may be given to direct or circumstantial evidence. Circumstantial evidence is entitled to no less weight than direct evidence just because it is circumstantial in nature, and in fact our trial lore is filled with illustrations of the persuasiveness of circumstantial evidence

8

in this motion raises an interesting and important question: Does Title VII impose an adverse action requirement upon an employee, even if the employee establishes that the employer subjected the employee to an employment action based upon the employee's sex?  Unfortunately for Plaintiff, the Eleventh Circuit has answered this question in the affirmative.

At least one panel of the Eleventh Circuit has addressed the issue squarely and concluded that "to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).[7]  Therefore, even if it were undisputed that the Defendant in this case intentionally discriminated against Plaintiff because of her sex, Plaintiff's claim is not actionable under Title VII unless she can also demonstrate that she was subjected to an adverse employment action that effected a "*serious and material* change" in the terms, conditions, or privileges of her employment. *Id.*

Although the Eleventh Circuit has ruled contrary to Plaintiff's position, the Court acknowledges that other circuits have adopted

---

(e.g., the tortoise on top of the fence post; rabbit tracks in the snow, etc).

[7]This panel decision has not been disturbed by any subsequent *en banc* ruling; nor has this Court been able to locate any contrary Eleventh Circuit panel decisions.  Therefore, it is clearly the law of this Circuit.

9

Plaintiff's approach.[8]  *See Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997) ("[D]issemination of the adverse job reference violated Title VII because it was a 'personnel action' motivated by retaliatory animus. That this unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability."); *see also Smith v. Sec'y of the Navy*, 659 F.2d 1113, 1120 (D.C. Cir. 1981)("[T]he questions of statutory violation and statutory remedy are conceptually distinct. An illegal act of discrimination . . . is a wrong itself under Title VII, regardless of whether that wrong would warrant an award of back pay or preferential hiring. The goal of the statute is to bar all employer actions based on impermissible factors."). The rationale of these cases may be persuasive if the Court were not restrained by *stare decisis*.[9] This Court, however, is

---

[8] The Court notes that the only Eleventh Circuit case cited by Plaintiff in support of her argument is clearly distinguishable because it does not address the issue presented here. Plaintiff cites to *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468 (11th Cir. 1999). In that case, the defendant admitted that it made race-based assignments to employees making "get-out-the-vote" calls, which led the district court to hold the defendant liable for intentional discrimination under 42 U.S.C. § 1981. *Id.* at 472. There is no discussion of the adverse employment action requirement in *Ferrill*, leading the Court to conclude that it was not raised. Instead, the focus on appeal was whether the defendant could still be held liable under § 1981 for intentional discrimination when there was no evidence that it acted with racial animus. *Id.* at 473.

[9] The Eleventh Circuit panel decision in *Davis vs. Town of Lake Park* is based upon the court's statutory interpretation of the anti-discrimination clause of Title VII. However, a plain reading of that clause does not expressly reveal a "material adverse employment action" requirement. The statute simply provides that an employer cannot discriminate "with respect to" the "compensation, terms, conditions or privileges" of an employee's employment. In other words, although the statutory language supports the interpretation that there must be some connection between the discrimination and the employee's employment, it does not impose any baseline requirement

bound by the decisions of the Eleventh Circuit, and those decisions clearly impose an adverse employment action requirement upon the Plaintiff in this case. Therefore, the Court must reject Plaintiff's argument that she is excused from producing evidence that she was subjected to an adverse employment action simply because she has produced direct evidence that she was subject to discrimination.

Plaintiff argues in the alternative that even if she is required to prove that she was subjected to an adverse employment action, she has produced sufficient evidence to survive summary judgment on this issue. Plaintiff alleges that Owens's decision to move her

---

on the extent that the discrimination must affect the employment relationship before the discrimination becomes actionable under Title VII. A strong argument could be made that if Congress had intended that discrimination having a *de minims* effect on the employment relationship should not be actionable, it could have said so. Since it did not, one could argue that the courts should not rewrite the statute to include such a requirement, particularly given Congress's intention in enacting Title VII to rid the workplace of unlawful discrimination. For a more detailed analysis of an approach contrary to that taken by the Eleventh Circuit, see Rebecca Hanner White, *De Minimis Discrimination*, 47 Emory L.J. 1121 (1998) (discussing approaches of different circuits in requiring adverse employment action and criticizing courts that limit actionable Title VII claims to ultimate employment decisions or materially adverse actions). The Court hastens to add, however, that a compelling argument can be made in support of the Eleventh Circuit approach. It is reasonable to conclude that the imposition of an adverse employment action requirement is implicit in Title VII because Congress could not have intended for every employment action, however slight, to result in a federal lawsuit and jury trial with courts and juries acting as super-personnel review boards. Just as summary judgment is appropriate to "police the baseline" for hostile environment claims notwithstanding the fact-intensive nature of such claims, *see Mendoza vs. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc), *cert. denied,* 529 U.S. 1068 (2000), the adverse employment action requirement may be appropriate to police the baseline of all Title VII claims. In any event, the issue is purely an academic one in the Eleventh Circuit, unless that Court decides to take up the issue *en banc* and reverses *Town of Lake Park* or unless the Supreme Court grants *certiorari* in a future case and resolves the circuit split.

11

constituted an adverse employment action because her transfer subjected her to either: (1) the "lower-profile" pump station position at CWW at the same rate of pay ($10.00/hour), but during the second shift; or (2) a position at a different site at her current first shift hours, but a lower rate of pay ($7.00). Plaintiff was offered and turned down the second shift position at CWW.

Eleventh Circuit case law is clear on this issue. A transfer must be objectively and materially adverse. *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1453 (11th Cir. 1998); *see also Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004) ("'[N]ot everything that makes an employee unhappy is an actionable adverse employment action.'"). The transfer to the second shift pump station position at CWW does not amount to an adverse employment action. Plaintiff characterizes it as a lower-profile position compared to the front gate because the front gate involves regulating the traffic in and out of CWW by making sure anyone coming in is authorized to have access. The pump station position, in Plaintiff's description, consists of "watch[ing] the water." (Pl.'s Aff. ¶ 2.) However, the proposed transfer to the second shift did not affect Plaintiff's rate of compensation or her basic duties as a security guard: guarding the water supply and patrolling and monitoring the client's property. Although Plaintiff asserts that the pump station position is lower-profile and apparently lacking prestige, there is no evidence that it would affect Plaintiff's career or opportunity for advancement at

12

Burns. *Doe*, 145 F.3d at 1452 n.9 (recognizing that diminishment of prestige may affect employee's marketability, but holding it is "not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities").

The most significant change caused by the proposed transfer would be Plaintiff's working hours. On the second shift, she was scheduled to work from 3:00 p.m. to 11:00 p.m. Owens did testify that the first shift is a sought-after position for many Burns employees, presumably because its hours track what most people consider to be a normal workday. However, Plaintiff's subjective preference as to her shift hours, particularly when Burns makes no guarantee as to her certain hours or even specific rates of hourly pay, is not relevant to the evaluation of whether an adverse employment action occurred. *Cf. Doe*, 145 F.3d at 1452 (holding that employee's subjective preference for his previous position is not relevant to adverse employment action inquiry); *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) (explaining that where plaintiff complained of transfer to night shift, "[m]erely changing [plaintiff's] hours, without more, does not constitute an adverse employment action"). Here, the transfer within CWW consisted of a change of hours and nothing more, which is insufficient to establish that Plaintiff suffered an adverse employment action.

This case presents an additional issue that is not present in most of the reassignment cases that the Court has located. In this

13

case, Plaintiff contends that the offer of reassignment, which she never accepted, was not a true offer because Defendant knew that she could not accept it because of her child care needs. Therefore, the true offer, according to Plaintiff's argument, was the first shift position at another site at a lesser rate of pay. Since that position provided less pay, Plaintiff argues that it was clearly an adverse employment action.

In support of this argument, Plaintiff has testified that while she initially worked on the third shift during her employment with Burns, she requested to work the first shift because of her difficulties in making child care arrangements. She testified in her deposition that Owens knew that she could not work anything other than the first shift because she had to obtain child care. The question becomes whether Plaintiff suffered an adverse employment action because Owens, knowing that Plaintiff would turn down a second shift position at CWW, instead moved her to the available first shift position at a lower hourly rate.

Viewing the second offer made to Plaintiff in isolation, Plaintiff could establish that if that position were the only option provided to her, then a mandatory transfer to that position would be an adverse employment action because it provided for a lower hourly rate of pay. The facts of the case, however, are that Plaintiff was first offered a position that as a matter of law was not an adverse employment action—reassignment to another shift at the same rate of

pay and same benefits.  To accept Plaintiff's contention would convert Defendant's first offer into an adverse employment action because Defendant subjectively concluded she could not accept it due to her child care needs.[10]  Because Plaintiff's subjective desire to work on the first shift is insufficient to establish an adverse employment action, her employer's knowledge of that preference is similarly insufficient evidence of an adverse employment action.[11]

Plaintiff's Title VII sex discrimination claim fails because of her inability to produce evidence from which a reasonable jury could conclude that she suffered an adverse employment action. Accordingly, Defendant's Motion for Summary Judgment is granted as to this claim.

### B.   Intentional Infliction of Emotional Distress

To recover for intentional infliction of emotional distress, "the defendant's actions must have been so terrifying or insulting as naturally to humiliate, embarrass, or frighten the plaintiff." *Moses*

---

[10]Plaintiff admits in her deposition that she made no effort to make alternate child care arrangements before turning down the second shift position.

[11]The Court acknowledges that Plaintiff could conceivably craft an argument that reassignment to the second shift was in effect a constructive discharge or constructive demotion.  However, to establish a constructive discharge or demotion, Plaintiff must show more than inconvenience.  She must establish that the working conditions associated with the reassignment were so intolerable that a reasonable person in her position would have been compelled to decline the reassignment.  *See Poole vs. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir. 1997).  Plaintiff has failed to produce sufficient evidence from which a reasonable jury could conclude that the reassignment to a different shift with the same rate of pay was so intolerable that a reasonable person could not have endured it and thus would have been forced to decline it.

15

*v. Prudential Ins. Co. of Am.*, 187 Ga. App. 222, 224, 369 S.E.2d 541, 542 (1988). A plaintiff therefore must show:

> (1) that the defendant's behavior was willful and wanton and intentionally directed to harming plaintiff; (2) that the actions of the defendant were such as would naturally humiliate, embarrass, frighten, or outrage the plaintiff; and (3) that the conduct caused mental suffering or wounded feelings or emotional upset or distress to the plaintiff.

*Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166, 170, 381 S.E.2d 303, 306 (1989). Liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Jenkins v. Gen. Hosps. of Humana, Inc.*, 196 Ga. App. 150, 152, 395 S.E.2d 396, 398 (1990). Liability has only been found when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Phinazee v. Interstate Nationalease, Inc.*, 237 Ga. App. 39, 40, 514 S.E.2d 843, 845 (1999) (internal quotation marks omitted).

Plaintiff has failed to show that the behavior of Defendant was sufficiently extreme and outrageous to survive summary judgment, even assuming Plaintiff's allegations to be true. Plaintiff has shown only that Owens proposed to transfer her based on her sex, where the initial proposed transfer did not effect any substantial change in her terms, conditions, or privileges of employment. These facts are clearly insufficient to establish any issue of fact regarding the

16

egregiousness of Defendant's alleged behavior.[12]  *See, e.g.*, *Beck v. Interstate Brands Corp.*, 953 F.3d 1275, 1276 (11th Cir. 1992) (per curiam) ("[D]ischarge for an improper reason does not constitute the egregious kind of conduct on which a claim of intentional infliction of emotional distress can be based."); *Ward v. Papa's Pizza To Go, Inc.*, 907 F. Supp. 1535, 1540-41 (S.D. Ga. 1995) ("Being denied a desired position is indeed a blow . . . and the emotional slight is surely magnified if suspected of growing from illicit motives.  Even so, such emotional duress falls within that class of life's vagaries for which the law gives no comfort . . . ."); *Hendrickson v. Pain Control & Rehab. Inst.*, 205 Ga. App. 843, 845, 424 S.E.2d 27 (1992), *rev'd on other grounds,* 263 Ga. 331, 434 S.E.2d 51 (1993) (regarding claim of disability-based discrimination, noting that demotion or discharge "for whatever reason, without more, gives rise to no claim for the intentional infliction of emotional distress").

---

[12]Plaintiff cites two Georgia cases in which the Georgia Supreme Court found that defendants were liable for intentional infliction of emotional distress, arguing that the cases support the proposition that a claim for intentional infliction of emotional distress may be based on a claim of race discrimination.  *Blockum v. Fieldale Farms Corp.*, 573 S.E.2d 36 (Ga. 2002); *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E.2d 835 (Ga. 1991). Although there is no doubt that, under certain circumstances, a defendant's racially discriminatory conduct may be so outrageous or wanton as to cause a plaintiff severe emotional distress, plaintiff makes no effort to establish why that is true in this case.  *Blockum* is distinguishable from the facts of this case in that it involved years of ongoing discriminatory treatment and fraud that caused the plaintiff to seek medical treatment. In *Yarbray*, the plaintiff was threatened with termination prior to her deposition in a discrimination lawsuit and was transferred to a less prestigious position after she gave unfavorable testimony, all in retaliation for filing her own charge of discrimination.

17

Furthermore, Plaintiff admits that she never sought medical treatment for her alleged severe emotional distress and that she does not know how long her distress lasted.  Her alleged distress manifested itself, according to Plaintiff's testimony, in Plaintiff being "real sick," "stressed out," "worrying," and "nerves . . . on end."  Plaintiff testified that she was sick to her stomach and could not eat and occasionally took a Tylenol PM to sleep.  She also took Phenergan, a prescription medication, for nausea, but admitted that she obtained this from her neighbor, not a doctor.  To be actionable, "'the distress inflicted [must be] so severe that no reasonable man could be expected to endure it.'" *Moses*, 187 Ga. App. at 226, 369 S.E.2d at 544.  These allegations are also insufficient to show that Plaintiff's alleged resulting distress was severe.

The Court finds that Plaintiff has failed to produce sufficient evidence from which a reasonable jury could conclude that Defendant is liable for the intentional infliction of emotional distress. Accordingly, Defendant is entitled to summary judgment on this claim.

## IV.   CONCLUSION

Based upon the foregoing, the Court grants Defendant's Motion for Summary Judgment as to all of Plaintiff's claims.

IT IS SO ORDERED, this 28th day of June, 2005.

                                        S/Clay D. Land
                                          CLAY D. LAND
                                          UNITED STATES DISTRICT JUDGE